We will proceed to the next case before us today which is 21-2011 OXY USA v. DOI. Counsel for appellant when you're ready please make your appearance. Good morning. May it please the court. James Auslander for appellant OXY. I'd like to reserve three minutes for rebuttal if I may. The Office of Natural Resources Revenue here retroactively inflated the valuation of carbon dioxide production from certain federal leases to demand millions of additional royalty and interest dollars. The district court then essentially rubber-stamped what Honor said. What did they use to base their inflation on? I'm sorry. What did they use to base their inflation on? You said they inflated the value. Yes, Your Honor. So Hess was the former owner of the leases, used a formula that had long been accepted by Honor called the weighted average price. Honor replaced that unilaterally with something called, well, two different methods. One called the Smithson arbitration formula and another one called the Hess purchase price. And isn't it Honor's responsibility to audit the royalties? It is, Your Honor. So once there has been a practice in place, are they bound by that former practice? No, Your Honor. And I hope that we were clear in our briefing that we're not arguing a stopple. Honor is free to examine methods of valuation. Things change over time. But the burden is on Honor to justify a change from a longstanding practice. And under the current regulations, as Honor and the district court both recognize, it puts constraints on Honor's discretion to do so. But the discretion that Honor exercised in promulgating its 1988 regulations, and everybody agrees that those are the regulations that apply here, require first that Honor demonstrate that the valuation used by the lessee was improper. And then it may revalue as long as it can justify it based on the record. The way that Honor and the district court wrote the decision is basically Honor substituted its own valuation, Smithson, and then proceeded to describe why it liked that one better than what Hess had used for over 20 years. Well, what was wrong with its considering the Smithson settlement? There's a lot, Your Honor, that's arbitrary about the Smithson formula. The main reason that Smithson is arbitrary is that it completely undercuts the reason that Honor rejected the weighted average price that Hess had used in the first instance. If the weighted average price that Hess used was improper because the Bravo Dome unit includes non-federal leases, as well as federal leases, then to rely completely on an arbitration formula in a dispute purely among private leases. Well, don't we get down to the problem here of what can they rely on, what should they rely on? And I thought they thought Smithson was really a pretty fair analysis. It was an open arbitration. The records were transparent. It was, there was representation on both sides and, you know, they sought to be a reasonable adjudication. Yeah, Your Honor, I understand that that's what Honor said and that's what the district court eventually signed off on, but I point that the record does not support that conclusion. You can't reach that conclusion based on the reasons for rejecting Hess's evaluation method. They're just, there's unexplained inconsistency there. And the reason, again, main, there's several reasons why Smithson is arbitrary, but the main reason that the decision adopting Smithson as arbitrary is because if it's going to solely rely on a non-federal dispute and Honor agrees and the district court agrees that non-federal leases and federal leases are different, that the valuations are different, they're not held to federal royalty standards, private leases might be. Don't we have a problem in this case with arms length contracts? And that's, that's really what Honor was trying to find. Try to find a solid, fair justification for the pricing. Yeah, well, Your Honor, I would just take a step back and say that what Honor, the whole premise of Honor trying to find a new valuation, you don't get there because, again, under the regulatory regime that everybody agrees applies, Honor doesn't get to do what it did before 1980. It can't just substitute what it wants because it's a higher valuation. It could have done that before the regulations, but it promulgated new regulations. And to get around that, Honor found that it's new regulations don't apply at all. That was the first time it ever had done that and no court has ever held that 1980 regulations don't apply to post-1980 in production. So that's a... Does it matter here? I'm sorry? Does it matter here? That is the factors under the lease and the factors under the regulation are the same? Well, Your Honor, again, that it's, it's a different, it's a different, it's a different regulatory construct. So the legal discretion in Honor before the 1980 regulations to dictate how royalties would be valued, and that was the problem, respectfully, was the system would allow Honor to revalue production years after the fact, and lessees had no confidence in that what they would use would actually be upheld later. And so the way that the regulatory history evolved, and we discussed this in our brief at length, is that Honor created more certainty for the lessee. And one of the fundamental principles of valuation, federal valuation, in the last three decades has been that lessees determine the value in the first instance. And Honor can audit for sure, and Honor has standards that it has to meet in assessing an audit, and it has to document when there are problems with the, with the valuation, and then it can substitute its own if it can justify what a substitute. The Honor, the analysis basically here was that, well, the lease before 1988 said discretion, and the factors under the second benchmark say all these other things that you can consider. And so those look similar, right, and so why can't we just use both of those things? But you don't get there, because Honor doesn't get to substitute those factors at the, at the outset. It, it, it, there's no dispute that the second benchmark for 20 years. So why is it suddenly, why is it suddenly inappropriate, and why suddenly is this arbitration formula that's never been used for any CO2 production, and not even these two other, that actually were the final product, other options that were the final products of litigation, and were settled upon, right? Why were those things never utilized? Instead we landed on open, transparent, the other settlements were not. They didn't know what went into basically the math formulation in those settlements. Your Honor, I think that the fear of settlement was just as transparent, if not more so, than the, again, I'll call it an interlocutory relic, is really what the Smithson arbitration formula was. Well, let me follow up on that, and particularly Judge Briscoe's point about transparency. Sure. And this gets to your point of whether there was an inconsistency or not between Honor relying on the Smithson formula when it rejected the unit average because of concerns about not being able to evaluate whether they were arms lease contracts or not. In other words, they were, oh no, I'm sorry, private contracts. Different reason. Yes, yes, different reason. Well, if the Smithson formula and that arbitration record was transparent, couldn't it be argued, and I want to understand your response to it, that that was a sounder footing than the unit average because of an information gap? In other words, the agency, Honor did not have information about the particulars of the private contracts that made up the unit average, whereas there was more information that was available in connection with the Smithson formulation. And if your response goes to the question, well, they could have gotten that information, then my answer, my next question will be, why was it their burden to get that information? Sure. Well, I'll answer that two ways. Let me first start with the Smithson formula. I would say the Smithson was not as transparent as Honor makes it out to be. There was an arbitration panel. It rendered a six-page decision, and within a couple sentences said there were several options that were vouched by the parties. And again, this was Hess and the private parties. Honor had no insight into at all, participation at all. There's no federal leases at issue. And so what they ultimately ruled in a snippet was that we're going to pick this one. We're going to pick this formula. That was appealed to the district court. It was not accepted. There was no settlement agreement, and it was superseded. The parties reached a settlement agreement. So this, again, it's a relic of history. It hasn't been used for federal CO2. It hasn't been used for private CO2. It just exists out there in the ether, but there's no real light about how the panel got to its decision, and there's no history of utilizing it. And that's what I want to get at. The question of whether it was finally approved or not, as the underlying decision documents talk about, it seems to me that's irrelevant. I mean, the point was whether this was a good metric. Nobody was questioning whether it was controlling or binding on anybody. It was just whether it was a guidepost. So my question to you would be, on this whole transparency point, yes, six-page document was what ended up being the arbitrator's decision. Was there access to the underlying information that formed the basis for the public arbitration? Was there access that could have been had and was had here by Honor to the underlying data for that decision? Yes, Your Honor, and I'll answer the first part of your question, which is, yes, Honor could have gone out and asked for the information. Honor ruled against the weighted average price of pure speculation. Okay, then I want to be clear. Honor had access to that information in the Smithson context. It could have gotten that information in this context. Well, then that goes to the question I was going to ask you as a follow-up. Why was it their obligation to do that? I mean, the burden was upon you, wasn't it? Well, Your Honor, during an audit, again, the burden is originally on the lessee. The lessee establishes valuation. The Tenth Circuit has been clear that if they're going to challenge that, Honor has to show substantial evidence in the record in order to overturn that decision. Okay, Honor, in an audit, and Honor also has audit standards, the generally accepted audit standards for government audits, the GAGS, G-A-G-A-S, and Honor has procedures that it has to follow to demonstrate that there is error. What Honor said here was, well, we suspect that this thing that we've approved for the last 20 years might not yield as high a price as this other method that we might like better, and so Honor said that we will go ahead and displace it because, let's say, it might have non-arms-length contracts in it, even though that's legally irrelevant, it's not a disqualifier. It might have non-federal leases in it, but that's always been the case at Bravo Dome. The Bravo Dome unit, when it was approved back in 1979, always had a majority of non-federal leases, and then it found that it was an average, and sometimes the price that Hess had paid for other CO2 in Texas was lower than the average. Well, sometimes it's lower, sometimes it's higher. Well, when was it? Well, as I understood it, the fact of the matter was that Hess was paying more for it when it went on the open market to get CO2 than it valued its own CO2 for royalty purposes. Is that not the case? Your Honor, I think that that's disputed. I think that it's different CO2, it's different transactions. Again, CO2 is different. It's not like CO2 is used primarily in tertiary recovery of oil and gas operations, and so the majority, there's not a dispute, the majority of the CO2 produced here was utilized in end-of-life operations, right? But again, to Your Honor's question, the use of non-arms-length pricing and the fact that Honor didn't understand what went into the weighted average price and would look into what went into the weighted average price, but then adopted Hess's weighted average price based on, admittedly, non-arms-length transactions. There's just a total disconnect between the reasons for rejecting Hess's method and the reasons for accepting not one, but two different substitute methods for the same audio. Okay, and on the two, you're talking about the Smithson arbitration, and then you're talking about the Hess value? The Hess average, yes, Your Honor. Yes, but I thought the Hess average, and this is where you can correct me, I thought the Hess average involved going out into the open market and purchasing CO2. Is that not right? No, Your Honor. I believe the Hess average involved, it may involve some arms length, but it also involved some purchases or use of, some use of CO2 that had been produced in the Broadway Dome unit, but there also was use of non-arms-length contracts. I believe Honor said in the record, it could not verify that the Hess average held all arms-length agreements, the same reason that it rejected the weighted average price. Yeah, but I mean, but it suggested, as it relates to the unit average, that that was sort of a black box filled with potential arms-length transactions, I mean, non-arms-length transactions that they couldn't verify. In this instance, we're talking about the opposite, right? They're saying, we can't say that this doesn't exclude non-arms-length transactions, but it does give us a good metric. Well, Your Honor, again, I don't think Honor looked carefully at the Hess average. I think Hess picked it because it was a higher value, and ultimately, the same reasons were used on both ends to reject and accept, and that's classic unexplained inconsistency that this Court has found arbitrary and capricious under the administrative procedure. Your time is up. Yes, I see. We'll see how things go, but we may give you a little rebuttal at the end, all right? Thank you, Your Honor. I appreciate it. Good morning, Your Honors. Andrew Birney on behalf of the Department of the Interior. I'd like to just jump right into a few of the arguments Mr. Auslander made, if I could, and then I hope to have a few remarks on why the agency properly rejected the unit average more generally. Just in terms of the inconsistencies between the agency's reasons for rejecting the unit average and the substitute valuation method the agency imposed, I think the agency fully explained why there aren't any inconsistencies here at all. I mean, starting with the Smithson case, the reason the agency rejected a unit average comprised overwhelmingly of values from non-federal lessees is because, as I think some of Your Honor's questions indicated, because the agency doesn't have any insight into how those values were calculated. It doesn't subject those entities to audit. They're not subject to honors regulations. The Smithson... Well, and opposing counsel in his brief argues at length that, well, you should have gone out and found out what went on in these contracts. Sure. I was going to get to that too, but I'm happy to address that in detail now. First of all, what we understand them to be saying is we should have gone to the unit operator to ask them the basis for which the unit average was calculated. I think that's flawed on at least two levels. First of all, nothing in the regulations I think even arguably requires the agency to do that. And I also think that would be quite an imposition on the agency in this context. What the agency would have to do when it essentially is it would be getting information and then investigating the bases and for all of the valuations for all the non-federal lessees in the unit simply to audit the values reported by this one federal lessee. I think that even if the agency were able to do that, I think certainly nothing would require that. And it would be really quite an undertaking. But also, I mean, more to the point, Your Honor, I don't... I think Honor addressed that and explained why that even if it was able and willing to do that, why that wasn't really a practical solution. Just to clarify what Honor could do and what it supply the values that non-federal lessees reported to the unit operator. But what I don't think Honor could do, and Honor said that, is figure out and dive into the basis for the values that the non-federal lessees reported to the unit operator. We don't know, for example, if they deducted the values by the cost necessary to place a marketable condition, whether they took transportation deductions. I don't think they would have the sales contracts and other confidential business information the non-federal lessees used to calculate it. And it's just, it's a black box. And coming back to that, there's a huge difference between that in the Smithson dispute, which was a specifically adjudicated formula price arrived at by a neutral arbitration panel involving Hess's CO2 in an arbitration in which Oxy, excuse me, Hess had a full opportunity to propose by each of the parties tied to market conditions and expert testimony. And I think that's just fundamentally different than just, there's no inconsistency between the agency thinking it could rely on that, but not rely on non-federal lessee data that is not, that it can't verify more generally. And in terms of the fear settlement that Mr. Auslander referenced, that there's an inconsistency between not relying on that, the agency explained that as well. And there's no inconsistency because I think that Oxy is just comparing apples and oranges because the agency did not rely on the Smithson settlement. It had relied on the Smithson arbitration decision. And to take your point, Judge Holmes, I think you're absolutely right that as we said, it's irrelevant that the arbitration decision isn't binding. I mean, just to use a basic analogy, it's the difference between citing it, using a decision for its persuasive value and using a decision for its precedential value. The agency was clearly, you know, acknowledged that the litigation settled while this was ongoing and that nonetheless did not prevent them from determining that this arbitration decision was reliable. So to be clear, so the distinction you're drawing between the Smithson settlement or formula and the Farrar settlement is what? Is that the Farrar settlement was a settlement. The agency didn't rely on the Smithson settlement. It relied on the Smithson arbitration decision that preceded the settlement. And I just want to address one other inconsistency Mr. Auslander discussed, which is this idea that the agency rejected the unit average because it was likely comprised substantially of non-arms length sales, but also relied in part on the Hess purchase average, which the agency acknowledged it could not verify were non-arms length sales. The agency explained that distinction too, and there are several differences. First of all, these purchases, unlike those other purchases, are verifiable. They pertain specifically to Hess. They used a variety of pricing mechanisms involving a large volume of CO2 throughout the period and resulted in a consistently, outside the Smithson period, resulted in a consistently higher value than the unit average. So for all of these reasons, I don't think there's any inconsistency. Well, I think that's what opposing counsel keeps saying. Well, you just did this so you could get more money. That was your end game. Let's just play around with the numbers until we can jack up the royalty. I understand. And that's not what the agency did here, Your Honor. And I'd like to act, that was going to be my next point. I want to just transition into this idea that the agency didn't really reject this under the regulation. It just determined that its method was better than Hess's and substituted. I don't think that that is at all a fair reading of the record. I mean, from the beginning, I'll first talk about the determination and then talk about the regulations. From the very beginning of this determination, the agency has made clear that it believed the unit average was improper. So starting in 2011, in correspondence with New Mexico that's in the record on page 410 of the appendix, they say it's not a reliable indicator of value and should not be used. It falls short. It's not readily verifiable as meeting value. Honor's order to Hess in 2011 on page 272 of the appendix calls it unacceptable. The agency then in its final decision talks about the previous decision finding that Hess improperly used the unit average. It then affirms that and talks in detail about the shortcomings of the unit average. So, you know, Judge Briscoe, to your point, I think this would be a different case or at least a harder case for us under the regulations if all the agency said was, yeah, these are two reasonable methods, but we're substituting ours because it produces a higher value. That's not what the agency did here. The agency clearly made a determination this was improper under the agreement. Because basically the calculations that you're relying on were not arm's length. Is that the real kicker here? That's one of the three. So the three, and I think they reinforce each other. So the three reasons is that these are non-federal lessees and we don't have any insight into how they calculate their values. We believe most of this is non-arm's length and there's various things, there's various discussion in the record about how at least two thirds of the CO2 is used by producers for their own internal purposes and their EOR recovery operations. And there was evidence that they were controlling the price. Right. Pushing the price down. Right, exactly. The various lawsuits in the record. And then the third was that it produced a consistently lower price than the Hess purchase price average. So, you know, Oxy tries to critique those individually, but, you know, what you have here essentially is a largely opaque and likely non-arm's length process involving non-federal lessees that consistently produces lower values than what Hess itself purchased CO2 at as well as the Smithson formula price. So I think it's quite reasonable in that context for the agency to determine that with those inputs and that output that the unit average does not adequately safeguard the public statutory interest in getting a reasonable royalty, getting its reasonable royalty interest from Hess's, the value Hess derives from these federal lands. We haven't, just briefly on the compression and dehydration issue that Mr. Alexander didn't get a chance to get to that. I think we would just rest on the briefs. It's very clear from the sources we cite, particularly the text of the regulation, I think that's 206.17 F9, that even if something is necessary for transportation, if it is also necessary for putting gas into marketable condition, it's only deductible if the transportation costs are solely for transportation and exceeds costs for marketing. And I think that it's clear from the record that as Honor explained in its decision that Hess has to compress the CO2 to 1,900 to 2,500 psig to use it for its own internal purposes in the EOR delivery. But it also had to compress somewhat, but not as much, just to begin the transportation through the initial pipelines. That's correct. So it has to go, it goes through multiple pipelines through the Denver pipeline, the EOR delivery pipeline, and the specific figures are set forth in Honor's decision, but there's no meaningful difference, even if they didn't have to do that. They would have to compress it to use it in EOR delivery pipelines. And the agency acknowledged, as the district court acknowledged, that yeah, this might have been necessary for transportation, but it was also necessary to bring it to marketable condition. And the text of the regulation, which I again just refer the court to, I think is perfectly clear that where that is the case that the costs are not deductible. What about their primary reason argument? Is it, do you have the idea that the primary reason for this was transportation, not marketing? Do you think the text of the regulation essentially puts a kibosh on that argument? I think it does, Your Honor, and I also just think that how we, as we said in our brief, and as the district court addressed, I just think that's an entirely arbitrary characterization. Hess ultimately wanted, needed to use the CO2 in the Permian Basin. So one could just as easily say that transportation, transporting it there, was just incidental to using it there. So I don't think that's a distinction that the regulation embraces, but even if it was, I think it's just entirely arbitrary. Are you aware of any legal foundation for that rationale? The primary purpose rationale? I'm not, Your Honor. Let me ask you somewhat of a housekeeping question. Well, one of the arguments that opposing counsel makes regarding the consistency and whether the leases were consistent with the regulation goes towards the notion that theirs was a standard form lease and that there were thousands of standard form leases of this sort out there, and they refer to, I think, a BLM form 3120-3. Number one, are you aware of that form? And number two, is there anywhere in that record where a generic version of that form exists such that we can compare that to the leases that are here? I apologize, Your Honor. I'm not sure. I mean, I have no reason to doubt their contention that there are standard form leases. There are four of them in the record here, and the court, as I may recall, had us submit revised copies. So we could read them. It's a crazy thing. No, I appreciate it. I mean, there was only one clause that from our perspective was relevant, but I appreciate the court's point that they were not accessible documents. But those four documents were essentially identical, and I have no reason to doubt that. Can I interrupt? My impression from your brief is that you probably prefer that we bypass that issue. Yeah, I think that's right, Your Honor. We have not heavily briefed that. I think that you barely briefed it at all, and every time it came up, you basically said you don't need to decide that. My sense was that maybe you'd prefer that we didn't suggest that all these standard form leases conflict with the regulations, even though that's the holding that you're here, apparently, to defend. So, I mean, I'll engage with that question directly, Your Honor. I mean, I think if I'm being perfectly honest, the question about whether the lease terms or the regulations control is, from our perspective, it's a difficult one. It is difficult. I don't think the question about whether or not or properly rejected this under the regulations is difficult by contrast. I know the court would know better than me, obviously, but the court, I think, often faces a situation in which there's a difficult question about which legal standard applies, and since the government satisfies both of them, the court doesn't decide that issue. So I think that's what we'll always think. Well, I guess that's still my question, though, would you prefer, I mean, what is your position if we did take on that issue? Do you really want us to hold and affirm the concept that these standard form leases, the thousands of them, conflict with your regulations? Well, they conflict, to be clear. Well, first of all, to answer your question, yes, we do defend that. It's not a major part of our argument, but they conflict in the sense that they allow the secretary to come in and establish a reasonable value even if the lessee has complied with the regulations. So it's basically who gets to go first. That's the inconsistency, right? Does the agency go first or the lessee? Well, I think it still came, not quite, Your Honor, I don't think, because it's still, the determination here under the leases still came after. Here's how I would put the difference. I think I said earlier in the argument that if Honor came in and said we have two methods here, both of these are perfectly fine under the regulations, but we're picking ours because it produces more value. I think that would be questionable under the regulations. I'm not sure, I'm not saying I wouldn't defend that, but I think they could do that under the lease. I think they could do something like that under the leases because it just gives them an absolute right to establish a reasonable minimum value. So I think that's the difference. Well, you start with that, but then Honor has the responsibility to audit that. So, you know, just because they say it doesn't make it so. I'm sorry, to audit what, Your Honor? To audit the final value. Right, right, to audit the final value. I mean, what I was saying is that the difference might be is that if Honor found it to be a reasonable value under, to answer your question about the type of case in which it might make a difference, if Honor found it to be a reasonable, if Honor found that the lessee reasonably applied the regulations under the regulations, or properly applied the regulations under the regulations, it would accept the lessee's value after an audit. But under the leases, it could still say this is, we're establishing a minimum value that's higher than that. So, but I don't think. We can say that both are reasonable, but we choose the one that gives us more money. Exactly, but because that is, to go back to what I said at the beginning of the argument, because we don't think that, because that clearly isn't what the record shows that the agency did here in its analysis, we don't think the court ultimately needs to reach that issue. I'm happy to address any other questions. Otherwise, we would ask the district court's judgment be affirmed. Thank you. Thank you, Your Honor. At 1.30, please. Thank you, Your Honor, for the additional rebuttal time. Your Honor, excuse me. Your Honor, I believe that counsel's last point basically concedes his case. Basically, that the decision did not even find that the weighted average price was improper and unreasonable. And I know that they've rewritten it in the briefs to basically say, oh, it's less reliable or it's improper. But the way that it was written, it was written to say that we like Smithson, and we like Smithson better than the weighted average price. Not that the weighted average price was an improper application of the regulations, but that we like it better because it's a higher value. Because they didn't rule that it's an improper application of the regulations. Under counsel's concession, it shouldn't... Well, I didn't hear that concession. And it would seem that the sum and substance of what the director did was essentially say that it wasn't reasonable, that there were problems with the weighted average. I mean, it didn't use the word, this is inconsistent with the regulations, but that was the sum of substance of what it did. But Your Honor, again, I believe that the way, again, it's even the way that it's structured. Smithson explains why they like Smithson. And then it follows on that Smithson is better than the weighted average price because the way it needs to proceed is you have to first look at the value. And counsel talked about black box. I just want to point out the 1988 regulations were issued to avoid cases like this, to render valuation like a black box. Take it from there. Hess valued it, sorry, for years at what was accepted as an acceptable price. And then years later, Honor comes back and says, no, we're going to use this far off arbitration method. And now that's effectively what applies. That's the black box. The Supreme Court and VP for Pete Burton said that it was... A minute and 30 just flies. I'm sorry? A minute and 30 just flies. I'm sorry. Apologies, Your Honor. No, there's no apology needed. Thank you for your fine arguments. Appreciate it. Appreciate it.